IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| CUMMINGS MANOOKIAN, PLLC, | ) | Case No. 3:19-bk-07235 |
|     Debtor. | ) | Chapter 7 |
| | ) | Judge Walker |
| BRIAN CUMMINGS, | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Proc. No. 3:23-ap-90036 |
| | ) | |
| BRETTON KEEFER; JEANNE | ) | |
| BURTON, TRUSTEE; and AFSOON | ) | |
| HAGH, | ) | |
|     Defendants. | ) | |

## RESPONSE IN OPPOSITION TO MOTION TO DISMISS

Continuing their pattern of delays and attempts to avoid any substantive ruling on Plaintiff Brian Cummings' claims, Defendants Afsoon Hagh and Bretton Keefer have asked this Court to dismiss Plaintiff's claims and issue an order compelling arbitration. This Court should deny Defendants' Motion for three reasons: First, this Court has exclusive jurisdiction over the matters at issue, as both the Trustee and the Plaintiff have filed claims for a portion of the attorney's fees generated by the lawsuit in which Defendant Keefer was plaintiff, and these intertwined claims should be determined in the same action. Second, there is no arbitration agreement between Defendant Hagh and Plaintiff, and it would be improper to force Plaintiff to arbitrate his claim against her. Finally, the Defendants waived arbitration when they insisted that Plaintiff file this litigation and then delayed seeking arbitration of the claims for more than one year.

### Statement of Facts and Procedural History

As the Defendants note in their Motion to Dismiss, there are two types of Rule 12(b)(1) motions: facial attacks and factual attacks. In a factual attack, the court considers evidence beyond

the pleadings to resolve jurisdictional facts. *Gentek Bldg. Prods. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). However, bringing a "factual attack" does not give Defendants leave to attack the merits of Plaintiff's claims by asserting competing unsupported "facts" in the guise of background information. The Sixth Circuit has made clear that a court "engages in a factual inquiry regarding the complaint's allegations only when the facts necessary to sustain jurisdiction do not implicate the merits of the plaintiff's claim." *Id*. If the attack on jurisdiction also implicates an element of the cause of action, the court "should find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's claim." *Id*. This "provides a greater level of protection to the plaintiff who in truth is facing a challenge to the validity of his claim: the defendant is forced to proceed under Rule 12(b)(6) or Rule 56, both of which place greater restrictions" on the court's discretion. *Id*.

This adversary proceeding is a dispute concerning the division of a legal fee earned in a wrongful death action (the "Shoemaker lawsuit") that was resolved at mediation in October 2021. (Doc. No. 5-15.)[1] The plaintiff in the Shoemaker lawsuit, Defendant Bretton Keefer, was initially represented by three attorneys: Plaintiff Brian Cummings, Defendant Afsoon Hagh, and Defendant Hagh's husband, Brian Manookian. (*Id*. at ¶¶ 2-5.) The three attorneys originally represented Defendant Keefer while practicing together at Cummings Manookian, PLC ("CM"). (*Id*.) In September 2018, Plaintiff voluntarily left CM and began practicing at Cummings Law. (*Id*. at ¶¶ 5, 8.) From that time until October 2020, Plaintiff and Defendant Hagh jointly represented Defendant Keefer (Mr. Manookian was suspended from the practice of law for the majority of the time that the Shoemaker lawsuit was pending). (*Id*. at ¶¶ 8, 14; Doc. No. 5-83.)

---

[1] Unless otherwise noted in the citations, all references to documents by number refer to documents that are part of the record in this adversary proceeding.

Between April 2017, when Defendant Keefer retained CM, and October 2020, Plaintiff performed a substantial portion of the legal work on the Shoemaker lawsuit, including performing all pre-lawsuit investigation, preparing the 65-page complaint, preparing a significant portion of the written discovery propounded upon the defendant in that case, preparing all of Defendant Keefer's written responses to discovery, taking and defending numerous depositions, retaining all Rule 26 witnesses and medical experts, and preparing the Rule 26 disclosures. (Doc. No. 5-15 at ¶¶ 11-13, 25-31.) Plaintiff also advanced over $60,000.00 in litigation expenses, representing 90-100% of all litigation expenses incurred by Defendant Keefer during Plaintiff's representation. (*Id*. at ¶¶ 39-40.) Plaintiff withdrew as counsel for Defendant Keefer in October 2020 after being told by the Board of Professional Responsibility that comments made by Defendants Hagh and Keefer required him to withdraw immediately, and on November 27, 2020, Plaintiff filed a Notice of Attorney's Lien in the Shoemaker lawsuit. (*Id*. at ¶¶ 14-20; Doc. No. 5-84.)

While the Shoemaker lawsuit was pending, in November 2019, CM filed a bankruptcy petition in this Court because of debts incurred solely due to the actions of Brian Manookian. (Doc. No. 5-3 at ¶ 2; Doc. No. 5-15 at ¶ 5; Case No. 3:19-bk-07235 at Doc. No. 1.) Shortly after Jeanne Burton's appointment as Trustee in CM's bankruptcy action, she filed an adversary proceeding against Defendant Hagh, Defendant Hagh's law firm, and Mr. Manookian's law firm (the "Hagh AP"). (Doc. No. 5-3 at ¶¶ 2-3; Case No. 3:20-ap-90002 at Doc. No. 1.) The Trustee raised numerous claims against Defendant Hagh and the other defendants in the Hagh AP based on their fraudulent transfers and conversion of property of CM, including attorney's fees to which CM was entitled, for the purposes of hindering, delaying, and defrauding creditors. (*See generally* Case No. 3:20-ap-90002 at Doc. No. 1.) The Trustee also raised claims of successor liability and alter ego based on the fact that Defendant Hagh and Mr. Manookian used the two defendant law firms to

3

transfer CM's assets and divert attorney's fees from CM in an effort to hinder, delay, and defraud CM's creditors. (*Id*.) Among the attorney's fees to which the Trustee has asserted a claim are the attorney's fees generated in the Shoemaker lawsuit (the "Keefer fee"), and the Trustee filed an attorney's lien in the Shoemaker lawsuit on October 29, 2021. (Exhibit 1; Doc. No 5-3 at ¶ 3.) Plaintiff is in agreement that a portion of his work on the Shoemaker lawsuit was performed while Plaintiff was still at CM, thus subjecting a percentage of Plaintiff's fee (and Plaintiff's lien) to the jurisdiction of the Bankruptcy Court. (Doc. No. 5-15 at ¶ 9.)

After the Shoemaker lawsuit settled, Plaintiff filed a motion for status conference concerning a hearing on his attorney's lien. (Doc. No. 5-15 at ¶ 22; Doc. No. 5-85.) Defendant Hagh, as counsel for Defendant Keefer, demanded that the state court require Plaintiff to file this separate action to resolve the issues regarding the division of the Keefer fee. (Doc. No. 5-86.) In a telephonic hearing with the state court regarding whether a separate action was required, Defendant Hagh represented that she would speak with Defendant Keefer to determine whether he wished to arbitrate Plaintiff's claim or waive arbitration. (Exhibit 4; Doc. No. 5-15 at ¶ 55.) Given Defendant Hagh's statement to the state court concerning possible waiver of arbitration, prior to filing the instant lawsuit, Plaintiff's counsel, Attorney James Price, contacted Defendant Hagh, as counsel for Defendant Keefer, to determine whether Defendant Keefer wished to proceed with arbitration of Plaintiff's claim or waive arbitration. (Exhibit 2; Doc. No. 5-15 at ¶ 55.) In a series of letters,[2] Defendant Hagh refused to answer the question of whether Defendant Keefer was waiving arbitration, and neither Defendant Hagh nor Defendant Keefer requested or mentioned

---

[2] Defendant Hagh made many false assertions in these letters concerning the merits of this case. To be clear, Plaintiff disputes Defendant Hagh's allegations regarding his representation of Defendant Keefer. Plaintiff is confident that the evidence regarding the merits of this case will demonstrate that Defendant Keefer received substantial benefits from Plaintiff's work on the Shoemaker case and that Plaintiff's work added significant value to the case.

4

arbitration until Attorney Spragens raised it in a letter sent to undersigned counsel on April 28, 2023, a week before filing the instant Motion. (Exhibits 2-7; Doc. No. 5-15 at ¶ 55.)

Plaintiff filed this lawsuit on March 22, 2022. (Doc. No. 5-1.) The Trustee removed the case to the District Court on April 26, 2022 and filed a motion to refer the case to this Court. (Doc. No. 5; Doc. No. 5-3.) No party opposed the Trustee's motion to refer the case to this Court. (Doc. No. 5-99.)

Plaintiff served Defendant Keefer via Certified Mail in June of 2022. (Doc. No. 5-25.) Attorney Spragens, who was counsel of record for Manookian PLLC at that time, sent a letter to Attorney Price claiming that service on Defendant Keefer was ineffective. (Exhibit 8.) Although Attorney Spragens offered to facilitate service, he did not respond to any of Attorney Price's requests concerning Defendant Keefer or Defendant Hagh. (Exhibits 8-9.) To resolve any doubt regarding service, Defendant Keefer was subsequently served again by private process server. (Doc. No. 5-49.)

Defendant Hagh actively evaded service of process for eight months. (Doc. No. 5-23; Doc. No. 5-29; Doc. No. 5-33; Doc. No. 5-39; Doc. No. 5-41.) In June of 2022, Plaintiff sent copies of the complaint and a request for waiver of service to Defendant Hagh at both the address she registered with the Tennessee Board of Professional Responsibility and her last known home address. (Doc. No. 5-33 at ¶ 11.) Plaintiff attempted to serve Defendant Hagh via Certified Mail, via private process server, and through counsel, before asking the District Court to order the U.S. Marshals Service to serve Defendant Hagh. (*Id*. at ¶¶ 7, 8, 12.) When the U.S. Marshals Service attempted service, Defendant Hagh's husband, Brian Manookian, intervened and aggressively impeded service, causing the Deputy U.S. Marshal to believe that Mr. Manookian would escalate the situation to a physical confrontation. (Doc. No. 5-67.)

5

Case 3:23-ap-90036   Doc 12   Filed 08/02/23   Entered 08/02/23 19:17:05   Desc Main
Document      Page 5 of 17

Plaintiff filed Motions for Entry of Default against Defendants on February 10, 2023. (Doc. No. 5-70; Doc. No. 5-73.) On February 24, 2023, Attorney Spragens advised that he had been authorized to accept service on behalf of the Defendants if Plaintiff withdrew his Motions for Entry of Default and agreed to grant the Defendants an additional 60 days to file a responsive pleading. (Doc. No. 5-97.) Plaintiff and Defendants submitted an Agreed Order setting forth this agreement.[3] (*Id*.) On May 4, 2023, Defendants filed the instant Motion demanding an order compelling arbitration of Plaintiff's claims, fifteen months after Defendant Hagh refused to respond to Plaintiff's questions regarding whether Defendant Keefer had decided to waive arbitration.

The only document cited by Defendants that Plaintiff signed that contains an arbitration provision is a representation agreement between Plaintiff and Defendant Keefer. (*See* Doc. No. 9-1, at pp. 1-3.) Plaintiff has never agreed to submit disputes between Plaintiff and Defendant Hagh to arbitration.

## Discussion

Defendants have asked this Court to dismiss Plaintiff's claims against them,[4] relying on an arbitration provision in the representation agreement between Plaintiff and Defendant Keefer.[5] This reliance is misplaced, and Defendants' Motion should be denied.

---

[3] Defendants assert that Plaintiff failed to serve the Amended Complaint pursuant to their agreement; however, it was served by email as the parties had agreed, immediately following the submission of the Agreed Order. (Exhibit 10.)

[4] Defendants ask this Court to dismiss Plaintiff's claims with prejudice; however, "a dismissal under Rule 12(b)(1) is necessarily not on the merits and thus is always without prejudice." *Property Mgmt. Connection, LLC v. Consumer Fin. Prot. Bureau*, 2021 U.S. Dist. LEXIS 219041 at *22 (M.D. Tenn. Nov. 10, 2021) (emphasis supplied).

[5] Although they devote the bulk of their Motion addressing the arbitration provision, Defendants assert in the introduction section of their Motion that there are two separate provisions of the representation letter justifying dismissal of Plaintiff's claims. To create the other purported reason for dismissal, Defendants characterize the final sentence of the arbitration provision as a "covenant-not-to-sue." It is clear from the plain reading of the paragraph on which Defendants rely that the final sentence of that paragraph is not a separate and distinct covenant, but is simply part of the arbitration provision. (Doc. No. 9-1, at p. 3.) Since Defendants have not made any arguments concerning the claimed "covenant-not-to-sue" that are distinct from their arguments regarding arbitration, Plaintiff has not made a distinction between the arbitration paragraph and that paragraph's final sentence in this Response.

**A. This Court Should Deny Defendants' Motion, Because this Court has Exclusive Jurisdiction Over this Proceeding.**

The District Court transferred this matter to this Court on March 13, 2023, pursuant to the Trustee's unopposed Motion to Refer Case to Bankruptcy Court. (Doc. No. 5-99.) In her Motion, the Trustee explained that, as part of her administration of CM's estate, the Trustee had filed the Hagh AP against Afsoon Hagh, Hagh Law, PLLC, and Manookian, PLLC. (Doc. No. 5-3 at ¶ 3.) According to the Trustee, a "significant element of the allegations in the [Hagh] AP is that the defendants in the [Hagh] AP, including Afsoon Hagh (who is a defendant in this matter), received fees belonging to CM," including the Keefer fee. (*Id*.) Since Plaintiff, Defendant Hagh, and the Trustee each claim an interest in the Keefer fee, Plaintiff's claims are directly related to the Trustee's claims in the Hagh AP and to the pending bankruptcy matter.

Bankruptcy courts have exclusive jurisdiction over bankruptcy cases, the property of a debtor, and the bankruptcy estate. *In re Project Restore, LLC*, 2022 Bankr. LEXIS 2868 at *12-13 (Bankr. M.D. Tenn. Oct. 7, 2022). This Court has noted that disputes involving the Bankruptcy Code and the Federal Arbitration Act "often present a conflict of near polar extremes: bankruptcy policy exerts an inexorable pull towards centralization while arbitration policy advocates a decentralized approach towards dispute resolution." *Id*. at *9. When evaluating motions to compel arbitration, courts are asked to determine whether the dispute is a core proceeding and whether an inherent conflict exists between the enforcement of an arbitration agreement and the underlying purposes of the Bankruptcy Code. *Id*. at *11. This involves conducting a "particularized inquiry into the nature of the claim and the facts of the specific bankruptcy" as well as consideration of the objectives of the Bankruptcy Code, such as "the goal of centralized resolution of purely bankruptcy issues, the need to protect creditors and reorganizing debtors from piecemeal litigation,

7

and the undisputed power of a bankruptcy court to enforce its own orders." *See Anderson v. Credit One Bank, N.A.*, 884 F.3d 382, 389 (2nd Cir. 2017).

Applying this analysis, courts around the country have found that arbitration agreements inherently conflict with the purposes of the Bankruptcy Code in a variety of circumstances. For example, the Second Circuit Court of Appeals found it was error to compel arbitration of a claim seeking a declaratory judgment of the parties' rights under various insurance policies, which provided the only funds available to numerous personal injury claimants. *U.S. Lines, Inc. v. Am. S.S. Owners Mut. Protection & Indem. Ass'n*, 197 F.3d 631 (2nd Cir. 1999). The *U.S. Lines* Court determined that the declaratory judgment proceedings were integral to the bankruptcy court's ability to preserve and equitably distribute assets, and that the need for a centralized proceeding was augmented by the complex factual scenario, involving multiple claims, policies, and insurers. *Id.* at 640-41.

Likewise, the Fifth Circuit Court of Appeals affirmed denial of a motion to compel arbitration of a debtor's claims, which included claims of avoidance of fraudulent transfers and to recover transferred property. *Gandy v. Gandy*, 299 F.3d 489 (5th Cir. 2002). The *Gandy* Court recognized that while the claims could technically be divided and some sent to arbitration, parallel proceedings would be wasteful and inefficient, and potentially could yield different results and subject parties to dichotomous obligations. 299 F.3d at 499. The Court found that arbitration of the debtor's claims inherently conflicted with the Bankruptcy Code's goal of centralized resolution, the need to protect creditors and debtors from piecemeal litigation, and the undisputed power of a bankruptcy court to enforce its own orders. *Id.* at 500.

The inherent conflict can exist even where the request for arbitration does not seek to compel any claims by or against the debtor to arbitration. The Fourth Circuit Court of Appeals

8

affirmed denial of a motion to compel arbitration of claims where the debtor was not going to be a named party in the arbitration, because the arbitration would substantially interfere with the debtor's efforts to reorganize. *Phillips v. Congelton, L.L.C.*, 403 F.3d 164 (4th Cir. 2005). The *Phillips* Court explained that the bankruptcy court's findings regarding the impact of the proposed arbitration on the bankruptcy proceedings confirmed that the arbitration was inconsistent with the purpose of the bankruptcy laws to centralize disputes about a debtor's legal obligations. *Id*. at 170. *See also In re EPD Inv. Co., LLC*, 821 F.3d 1146 (9th Cir. 2016) (affirming denial of motion to compel arbitration of Trustee's claims, including claims to disallow proofs of claims and to avoid fraudulent transfers); *Roth v. Butler Univ.*, 594 B.R. 672 (Bankr. S.D. Ind. 2018) (declining to compel arbitration where it would require the debtor to pursue the same claims against different parties in two forums, incur the cost of two separate proceedings, and face potentially different outcomes); *Larson v. Swift Rock Financial, Inc.*, 545 B.R. 47 (D. Colo. 2015) (affirming bankruptcy court's denial of motion to compel arbitration of trustee's direct claims, including trustee's § 548 claims).

Cummings Manookian, PLC filed this bankruptcy action nearly four years ago, in November of 2019. (Case No. 3:19-bk-07235 at Doc. No. 1.) After Ms. Burton was appointed as Trustee, she filed the Hagh AP against Defendant Hagh, Defendant Hagh's law firm, and Mr. Manookian's law firm, asserting multiple claims against Defendant Hagh and the other defendants based on their fraudulent transfers and conversion of property of CM, including attorney's fees to which CM was entitled, for the purposes of hindering, delaying, and defrauding creditors. (Doc. No. 5-3 at ¶¶ 2-3; Case No. 3:20-ap-90002 at Doc. No. 1.) The Trustee also asserted claims of successor liability and alter ego based on the fact that Defendant Hagh and Mr. Manookian used

9

the two defendant law firms to transfer CM's assets and divert attorney's fees from CM in an effort to hinder, delay, and defraud CM's creditors. (Case No. 3:20-ap-90002 at Doc. No. 1.)

The Trustee, Defendant Hagh, and Plaintiff all claim an interest in the same funds: the Keefer fee. (Doc. No 5-3 at ¶¶ 3-4; Doc. No. 5-15 at ¶¶ 9, 44-46.) Both the Trustee and the Plaintiff filed attorney's liens in the Shoemaker lawsuit. (Exhibit 1; Doc. No. 5-84.) There is no question that resolution of the competing interests of the Trustee, Defendant Hagh, and Plaintiff (including the attorney's liens and the Plaintiff's claim against the Trustee) in the same fee from the Shoemaker lawsuit is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (E), (H), (K), and (O).

The Court is therefore tasked with determining whether enforcing the arbitration provision relied upon by Defendants Hagh and Keefer inherently conflicts with the underlying purposes of the Bankruptcy Code. Compelling arbitration of Plaintiff's claims against Defendants Hagh and Keefer will result in piecemeal litigation concerning the proper distribution of the Keefer fee. More problematic is the fact that the resolution of the claims by and against the Trustee with respect to the Keefer fee in the bankruptcy court and resolution of the Plaintiff's claims against Defendants Hagh and Keefer with respect to the Keefer fee in arbitration will result in inconsistent rulings where both this Court and the arbitrator will be allocating the same fee, but among different parties. This is precisely the reason for the Bankruptcy Code's goal of centralized resolution of issues, and maintaining all claims regarding the Keefer fee in this Court is integral to the Court's ability to preserve and equitably distribute assets. As such, this Court should decline to compel arbitration of Plaintiff's claims and deny the Motion to Dismiss in its entirety.

10

**B. This Court Should Deny Defendants' Motion, Because There is No Arbitration Agreement Between Brian Cummings and Afsoon Hagh.**

Defendant Hagh's request that Plaintiff's claim against her be submitted to arbitration should also be denied because there is no basis for compelling arbitration of that claim. Although Defendants' Motion to Dismiss makes no distinction between Plaintiff's claim against Defendant Hagh and Plaintiff's claim against Defendant Keefer, there is a crucial difference relevant to the pending Motion: <u>There is no arbitration provision in any contract between Plaintiff and Defendant Hagh</u>. This is fatal to Defendant Hagh's request that this Court dismiss this case against her.

When considering a motion seeking to compel the arbitration of a dispute, the Court must first consider whether a valid arbitration agreement exists. *VIP, Inc. v. KYB Corp.*, 951 F.3d 377, 380 (6th Cir. 2020). Since arbitration is a matter of contract, "a court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate *that dispute*." *Id*. at 382 (*quoting Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297, 130 S. Ct. 2847, 177 L. Ed. 2d 567 (2010) (emphasis in original)). It also "goes without saying that a contract cannot bind a nonparty." *W.J. O'Neil Co. v. Shepley, Bulfinch, Richardson & Abbott, Inc.*, 765 F.3d 625, 631 (6th Cir. 2014) (*quoting EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294, 122 S. Ct. 754, 151 L. Ed. 2d 755 (2002)). It is well-settled that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Id*. (*quoting AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648, 106 S. Ct. 1415, 89 L. Ed. 2d 648 (1986)).

Relying on these principles, in *W.J. O'Neil*, the Sixth Circuit reversed dismissal of a plaintiff subcontractor's claims against an architect and a designer arising from the construction

11

of a hospital.[6] 765 F.3d at 627-28. The plaintiff subcontractor had a contract with the construction manager that contained an arbitration provision, and the architect and designer both had contracts with the property owner that contained arbitration provisions, but there was no contract between the plaintiff and the architect or the designer. *Id*. at 628, 632-33. As such, the Court found that the plaintiff had not consented to arbitrate its claims against the architect and designer and was entitled to pursue his claims through litigation. *Id*. at 633-34.

In *VIP, Inc. v. KYB Corp.*, the Sixth Circuit refused to force plaintiffs to arbitrate their claims against a manufacturer based on an arbitration clause in a warranty incorporated by reference in the plaintiffs' agreements. 951 F.3d at 380. The Sixth Circuit examined the language of the arbitration provision and determined that, by its terms, it only applied to claims filed by "original retail purchasers" of the products at issue. *Id*. at 383-84. The Court found that the plaintiffs were distributors, not original retail purchasers. *Id*. Even if, as the defendant asserted, the plaintiffs had agreed to the arbitration provision by reference, the Court concluded that the plaintiffs had not consented to arbitration of the claims at issue. *Id*. at 384. The Court stated: "No plain language reading of this arbitration provision evidences an intent to bind anyone to arbitration other than 'original retail purchasers.'" *Id*. at 383-84. Since the plaintiffs had not agreed to arbitrate the particular dispute at issue, the Court refused to force them to do so. *Id*. at 385-86.

Throughout the Motion to Dismiss, the Defendants repeatedly quote from a representation agreement between Plaintiff and Defendant Keefer. (*See* Doc. No. 9-1 at pp. 1-3.) Notably, there is no reference anywhere in the Motion to Dismiss or in the various exhibits to an arbitration

---

[6] The district court in *W.J. O'Neil* had concluded that the claims were barred by the doctrine of res judicata based on an arbitration between the plaintiff and the construction manager arising from the same construction project. 765 F.3d at 627. The construction manager had previously filed claims for indemnification against the architect and the designer, and those claims were adjudicated in a consolidated arbitration alongside the plaintiff's claims against the construction manager. *Id*. at 628-29. The Sixth Circuit held that the plaintiff's claims against the architect and the designer were not barred by res judicata. *Id*. at 627-28.

agreement between Plaintiff and Defendant Hagh. That is because no such agreement exists. Plaintiff did not agree to submit disputes between Plaintiff and Defendant Hagh to arbitration, and he cannot be forced to arbitrate his claim against her. Indeed, Defendant Hagh is not even mentioned as one of the attorneys representing Defendant Keefer in the representation agreement upon which she relies. (*See id*)

Even if Defendant Hagh had been a party to the arbitration provision, arbitration of Plaintiff's claim against her would still be improper. The arbitration provision refers to disputes arising between the attorneys and the client within the Attorney-Client relationship, not to disputes between two attorneys regarding division of a fee. (*Id*. at p. 3.) Plaintiff did not agree to arbitrate disputes that he has with other attorneys (and certainly not with an attorney who was not even a party to the arbitration provision), and it would be improper for this Court to force him to arbitrate a dispute that he did not agree should be submitted to arbitration.

### C. This Court Should Deny Defendants' Motion, Because the Defendants Waived Arbitration of Plaintiff's Claim.

Finally, the Court should deny Defendants' Motion on the grounds that, through their actions and deliberate tactics, Defendants have waived any rights they may have had to enforce arbitration.

The Sixth Circuit has previously found that a defendant waived its right to arbitrate by engaging in activities strikingly similar to those of the Defendants in this case. In *O.J. Distributing, Inc. v. Hornell Brewing Co.*, after the defendant terminated the parties' contract, the plaintiff initiated settlement discussions in April of 1997. 340 F.3d 345, 348-49 (6th Cir. 2003). The parties exchanged settlement correspondence for over a year, and the plaintiff filed suit in May of 1998. *Id*. at 347, 349-51. The plaintiff sent a Request for Waiver of Service to the defendant, which the defendant did not return, so the plaintiff sent a copy of the complaint to the defendant by overnight

courier. *Id*. at 347. In August and September of 1998, the defendant sent multiple letters to the plaintiff demanding arbitration and objecting to the plaintiff's attempted service. *Id*. On September 30, 1998, the plaintiff obtained an entry of default and filed a Motion for Default Judgment on October 2, 1998. *Id*. On October 5, 1998, the defendant initiated arbitration with the American Arbitration Association. *Id*.

The Sixth Circuit found that the defendant waived its right to arbitrate when it engaged in negotiations with the plaintiff for fifteen months before raising the issue of arbitration and did not initiate arbitration until after the entry of default. *Id*. at 357-59. The Court rejected the defendant's argument that it immediately demanded arbitration after the plaintiff filed suit, noting that the defendant waited another sixty days after plaintiff filed suit before demanding arbitration in a letter to plaintiff and waited more than five months before formally demanding arbitration with the AAA. *Id*. at 359. The Court found that the defendant had "slept on its rights for approximately fifteen months," while the plaintiff incurred costs.[7] *Id*. at 358-59. *See also General Star Nat'l Ins. Co. v. Administratia Asigurarilor De Stat*, 289 F.3d 434 (6th Cir. 2002) (finding that defendant waived its right to arbitrate where the defendant had actual notice of the lawsuit for 17 months but did not invoke the arbitration provision until after the district court had entered default judgment); *Hurley v. Deutsche Bank Trust Co. Ams.*, 610 F.3d 334 (6th Cir. 2010) (finding that defendants waived arbitration where they actively participated in litigation for 26 months).

In the instant case, the Plaintiff initially asked the state court where the Shoemaker lawsuit was pending to address his attorney's lien. (Doc. No. 5-85.) Defendant Hagh, as counsel for Defendant Keefer, demanded that Plaintiff's claim be addressed in a separately filed lawsuit. (Doc.

---

[7] In its analysis, the Sixth Circuit also looked at the prejudice these delays caused the plaintiff; however, the United States Supreme Court recently clarified that prejudice is not to be used as a condition for finding waiver, which is simply "the intentional relinquishment or abandonment of a known right." *See Morgan v. Sundance, Inc.*, 142 S. Ct. 1708, 212 L. Ed. 2d 753 (2022)

No. 5-86.) After representing to the state court in a telephonic hearing that she would speak with Defendant Keefer regarding whether he wished to arbitrate Plaintiff's claim or waive arbitration, Defendant Hagh refused to answer direct questions regarding whether Defendant Keefer waived arbitration. (Exhibits 2-7; Doc. No. 5-15 at ¶ 55.)

Plaintiff filed this lawsuit on March 22, 2022 and served Defendant Keefer via Certified Mail in June of 2022. (Doc. No. 5-1; Doc. No. 5-25.) Although he claimed he was only representing Manookian PLLC at the time, Attorney Spragens sent a letter to Attorney Price asserting that service on Defendant Keefer was ineffective. (Exhibit 8.) Attorney Spragens initially stated that he would facilitate service, but then failed to respond to any of Attorney Price's requests concerning Defendant Keefer or Defendant Hagh. (Exhibits 8-9.)

After convincing the state court that a separate lawsuit was required and then refusing to respond to Plaintiff's questions about arbitration, Defendant Hagh actively evaded service of process for eight months. (Doc. No. 5-23; Doc. No. 5-29; Doc. No. 5-33; Doc. No. 5-39; Doc. No. 5-41.) In June of 2022, Plaintiff sent copies of the complaint and a request for waiver of service to Defendant Hagh at both the address she registered with the Tennessee Board of Professional Responsibility and her last known home address. (Doc. No. 5-33 at ¶ 11.) After unsuccessful attempts to serve Defendant Hagh via Certified Mail, via private process server, and through counsel, Plaintiff asked the District Court to order the U.S. Marshals Service to serve Defendant Hagh. (*Id*. at ¶¶ 7, 8, 12.) Defendant Hagh's husband, Brian Manookian, intervened and aggressively impeded service by the U.S. Marshals Service, behaving in such a manner that the Deputy U.S. Marshal believed that Mr. Manookian would escalate the situation to a physical confrontation. (Doc. No. 5-67.)

Despite Defendant Hagh and Defendant Keefer having actual notice of Plaintiff's claims since December 2021 and actual notice of Plaintiff's lawsuit by June 2022 at the latest, neither Defendant requested or demanded arbitration until their counsel raised it one week before filing their May 2023 Motion to Dismiss. The Defendants remained silent about arbitration for 15 months, including refusing to respond to Plaintiff's express questions regarding whether Defendant Keefer had decided to waive arbitration. Even after Plaintiff filed Motions for Entry of Default and Defendants finally engaged counsel, Defendants waited another two months before demanding arbitration. In other words, even if the Defendants had an enforceable arbitration agreement, they slept on their rights for at least 15 months. Like the Sixth Circuit found in *O.J. Distributing*, *General Star* and *Hurley*, this Court should find that the Defendants waived arbitration and deny their Motion to Dismiss.

## Conclusion

For the foregoing reasons, this Court should deny Defendants' Motion to Dismiss in its entirety.

Respectfully Submitted,

**COUNTERPOINT LEGAL, PLC**

By: /s/ Elizabeth S. Tipping
Elizabeth S. Tipping, No. 023066
2689 Union Hill Road
Joelton, TN 37080
(615) 426-5566
liz@counterpointlaw.com
*Counsel for Plaintiff Brian Cummings*

## CERTIFICATE OF SERVICE

      The undersigned hereby certifies that a copy of the foregoing document was electronically filed and served via the Court's ECF system this, the 2nd day of August, 2023.

/s/ Elizabeth S. Tipping
Elizabeth S. Tipping, No. 023066
Counterpoint Legal, PLC
2689 Union Hill Road
Joelton, TN 37080
(615) 426-5566
liz@counterpointlaw.com
